(No. 19087.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS GOLUB, Plaintiff in Error.

*Opinion filed February 20, 1929.*

W. W. O'BRIEN, (CLYDE C. FISHER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DEYOUNG delivered the opinion of the court:

Thomas Golub and Nick Uzelar were indicted in the criminal court of Cook county for obtaining $2600 from Frank Zula by means of the confidence game. A jury found them guilty and they were sentenced to the penitentiary. By this writ of error Golub seeks a reversal of the judgment.

The prosecution's evidence tends to show the following facts: On September 26, 1927, Frank Zula was a bricklayer and cement worker and resided in the village of Dolton, in Cook county. Nick Uzelar called at Zula's home on that day and learned from the latter's wife where he was employed. Uzelar saw Zula and proposed that he build a house for him in Dolton. Discussion of the matter was resumed the next day. On September 28, the third day,

Uzelar again saw Zula and they went to view certain lots in Dolton which Uzelar claimed to own. When they had gone about three blocks they met plaintiff in error. Zula was an Austrian, and plaintiff in error, a stranger to him, professed to be a fellow-countryman and greeted him cordially. Plaintiff in error then drew from his pocket a paper purporting to contain the names of certain residents of the neighborhood and asked Zula and Uzelar whether they were acquainted with them. After a short conversation plaintiff in error opened his coat and displayed what appeared to be paper money and said that he had about $25,000 in his custody. As the three men continued on their way to inspect the lots plaintiff in error related a story of the discovery of gold on his father's farm in California, of the subsequent sale of the farm for a considerable sum of money, of his father's illness and advanced age, and of the necessity, as a priest advised, of the distribution of his father's wealth in order that he might recover his health. Plaintiff in error further told Zula and Uzelar that his father wished to distribute his money among poor people; that the money in the custody of plaintiff in error was to be so distributed, and that he would pay Zula and Uzelar each $1000 for their services in assisting him in the philanthropic enterprise. His father, he added, had cautioned him not to allow a person who had not saved money to be entrusted with it for distribution because he would likely appropriate it unto himself. Plaintiff in error for that reason wanted to be satisfied of Zula's and Uzelar's financial responsibility and requested that they show him how much money they had saved. Uzelar said he would withdraw his money from a Chicago bank. He left and returned in about twenty minutes, stating that he had telephoned from a bank in Dolton and had thereby obtained his money quickly. When Uzelar produced his money the plaintiff in error took it, wrapped it in a white handkerchief, opened his coat and shirt, placed the money near his heart for a moment, as he

said his father had directed, then withdrew the handkerchief and returned the money to Uzelar. Plaintiff in error asked Zula how much money he had saved, and when he answered that he had $2600 in the bank, the former expressed the wish to see it. Plaintiff in error then gave Zula and Uzelar each $20 as compensation for their day's services. Zula went to his home, obtained his bank book, issued by the First Trust and Savings Bank of Riverdale, and returned and exhibited it to the plaintiff in error. The latter stated that since he could not read he would have to see the money. Zula went to the bank and withdrew $2600. Plaintiff in error said that he expected to return to his home in California and requested Zula and Uzelar to buy a small suitcase for him, and the purchase was made. The three men proceeded to a vacant lot, where Zula gave his money to plaintiff in error, and the latter wrapped it in a blue handkerchief and repeated the ceremony he performed when he received the money from Uzelar. Plaintiff in error pretended to put the package which he said contained $25,000 and Zula's and Uzelar's money in the suit case. Uzelar locked the case and gave it to Zula, and an appointment was made to meet the following day to distribute the money amongst the poor and to pay Zula and Uzelar the stipulated compensation for their services in making the distribution. After leaving plaintiff in error and Uzelar, Zula returned to his home. He became suspicious, opened the suitcase by force and found that it contained only three one-dollar bills and some worthless paper. He reported his loss to the police department. Uzelar was arrested in Gary, Indiana, on October 24, 1927. He offered Zula a Marmon car and $500 if he, Zula, would tell the State's attorney that Uzelar was not one of the guilty persons. Three days later, upon identification by Zula, plaintiff in error was arrested in Washington Park, Chicago. From photographs Zula had previously identified plaintiff in error as the man who took $2600 from him. The money was never recovered.

The evidence on the part of the defense tended to show the following facts: Uzelar, the co-defendant of plaintiff in error, lived with his wife in the city of Hammond, Indiana. He had resided in various places in the United States, Canada and Alaska. He met Zula in Dolton about the time charged and talked with him about locating a roadhouse in that village. There was a roadhouse across the street from the building upon which Zula was employed at the time. Zula showed him some vacant lots, and while they were so occupied a stranger approached and talked with Zula, but Uzelar could not understand the conversation. Zula asked Uzelar whether he had any money, and when the latter answered that he had about $200, Zula wanted to borrow that sum. Uzelar refused to make the loan. He then accompanied Zula on his truck, first to his home and later to the bank. Zula withdrew some money from the bank, cashed some checks, bought a satchel at a store and put his money in it. Shortly thereafter Zula met a man on the sidewalk and spoke to him in the Bohemian language, but Uzelar did not know what was said. The man took the satchel from Zula and returned it to him. The stranger left with Zula on the latter's truck. Uzelar denied that he was acquainted with plaintiff in error, that he heard or participated in a conversation concerning the distribution of $25,000 among the poor, that he obtained money from a bank and exhibited it to plaintiff in error, or that he received $20 from the latter for services rendered. He admitted that Zula saw him in Gary and asked him for $2600, but he denied that he had the money or that he had offered Zula $500 and an automobile in settlement. He asserted, on the contrary, that Zula made such a proposition and that he refused to consider it.

Plaintiff in error testified that he was married and lived in Chicago and that he had resided in the United States twenty-one years. He denied that he had ever been in Dolton, that he had seen Zula prior to his arrest in Washington

Park, that he had a conversation with him concerning the distribution of $25,000, or that he took $2600 from him. He admitted that in 1926 he had pleaded guilty to a charge of obtaining money by means of the confidence game but stated that he was released on probation. He testified that after his release he conducted a retail grocery in South Chicago for a short time, but that he sold it in October, 1926, and had not been employed since.

The first contention made by plaintiff in error is that the venue was not proved. The representations which induced Zula to part with his money were made in the village of Dolton while the money was actually obtained in the village of Riverdale. The evidence shows that both villages are in Illinois, that they are contiguous to each other, and that Dolton is in Cook county, about a mile and a quarter from the limits of the city of Chicago. From the locations of places and distances shown it is apparent that the village of Riverdale is situated within the county of Cook. Proof of venue may be made by circumstantial evidence. It is sufficient if the evidence, as a whole, leaves no reasonable doubt that the act upon which the indictment is based was committed at the place laid in the indictment. (*People* v. *Talbe*, 321 Ill. 80; *People* v. *Ortiz*, 320 id. 205; *People* v. *Shaw*, 300 id. 451; *People* v. *Allegretti*, 291 id. 364; *Weinberg* v. *People*, 208 id. 15; *Porter* v. *People*, 158 id. 370.) Moreover, the court will take judicial notice that a particular city, village or town is in a certain county. (*Sullivan* v. *People*, 122 Ill. 385; *Sullivan* v. *People*, 114 id. 24; *People* v. *Suppiger*, 103 id. 434; *Harding* v. *Strong*, 42 id. 148.) The venue was sufficiently established.

Plaintiff in error further contends that the ownership of the money obtained by means of the confidence game was not proved. Proof of special ownership or interest in or custody of the personal property taken is sufficient to support the allegation of ownership in the indictment. (*People* v. *Fitzgerald*, 297 Ill. 264; *Barnes* v. *People*, 18 id. 52.)

The money was withdrawn from the joint account of Frank Zula and Mary, his wife, with the First Trust and Savings Bank of Riverdale. By the contract with the bank either depositor might draw upon the account. When the bank book was offered in evidence it was not objected that there was a variance between the allegation in the indictment and the proof of the ownership of the money obtained. That objection cannot now be entertained or considered. *People* v. *Shaw, supra.*

Complaint is made that the trial court erred in restricting the examination of Zula when he was called as a witness by the defense. He had testified for the prosecution. When called by the defense he was asked whether he had signed a complaint before a justice of the peace on October 3, 1927, and he answered in the affirmative. He was then asked, "And did you at that time swear that you were doped?" An objection by the prosecution was sustained. The record discloses that the court had previously given counsel for the defense permission to recall Zula as a witness upon counsel's assurance that he had information that Zula had made an affidavit before a justice of the peace to the effect stated and upon the representation that counsel wished to ask Zula impeaching questions touching that subject and then to offer evidence in support of the impeaching statements. Unable to produce such evidence when Zula was recalled, counsel sought a postponement of the trial, which was denied. Apart from the necessity of showing the materiality of the proposed evidence to some issue in the case to justify a postponement of the trial, the court evidently was convinced that counsel had been given sufficient opportunity to determine whether the desired evidence could be produced. There was no abuse of discretion in the trial court's ruling upon the objection.

Four hours after the jurors had retired to consider their verdict the trial judge called them into open court and inquired whether they had agreed upon a verdict. The fore-

man answered in the negative, whereupon the judge said, "I do not want you to tell me how you stand on guilt or innocence, but tell me how you are divided numerically." The foreman replied, "Nine to three." The court then said, "You ought not to have any difficulty in reaching a verdict on this evidence." An exception was preserved to the action and remarks of the court. The jury retired a second time and later returned a verdict finding both defendants guilty. A verdict should express the deliberate judgment of the jury. The juror, as well as the judge, has an independent duty to perform, and he ought to be left free to pronounce his own conviction. A verdict hastened by the action of the judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees. Remarks by a trial judge calculated to effect the rendition of a verdict without affording the jury an opportunity for careful consideration are unwarranted and often lead to great abuse. Whether the error is harmless or prejudicial depends upon the facts of the case. The trial judge's remarks of which plaintiff in error complains did not, either expressly or by implication, indicate that the jury should reach a particular conclusion. How long the jurors deliberated after they retired the second time to consider their verdict does not appear. The remarks should not have been made, yet it cannot be said that they interfered with the deliberations of the jurors to the prejudice of plaintiff in error or that they hastened the verdict.

The final contention of plaintiff in error is that the evidence raises a reasonable doubt of his guilt and is for that reason insufficient to convict him. It was the jury's province to determine the facts, and the evidence justifies the verdict.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*