(No. 19883.

The People of the State of Illinois, Defendant in Error, *vs.* George Raymond, Plaintiff in Error.

*Opinion filed February 21, 1930—Rehearing denied April 3, 1930.*

WM. SCOTT STEWART, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and ROY D. JOHNSON, (EDWARD E. WILSON, JOHN HOLMAN, and GEORGE S. LAVIN, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, George Raymond, was in the criminal court of Cook county indicted, tried, convicted and sentenced to the penitentiary upon an indictment for robbery while armed with a dangerous weapon. The record is here for review on writ of error.

Ole Peterson testified that on the day in question he was told by the cashier of the Service State Bank, located at 5601 West North avenue, in Chicago, to go down-town

and was given a package of money in a satchel and in the company of Thomas Meany, a guard, took a Yellow cab, and while riding in the direction of the down-town bank a big car drove them into the curb and four men jumped out and put shot-guns against him and one man grabbed the satchel and threw it into the machine; that he saw five men; that they jumped back in the car and "held the gun to him until they turned around the corner." The cashier of the bank testified that the package which Peterson had, contained over $18,000 of the lawful currency of the United States.

William Cusack, a lieutenant of police, testified that he arrested plaintiff in error in Melrose Park on August 21, 1928; that he took him to the Melrose Park police station, where he was searched and $80 found on his person; that the next day plaintiff in error freely and voluntarily made and signed a written statement as to the crime; that he did not injure or threaten plaintiff in error in any way or promise him any immunity or favor. This statement was introduced in evidence without objection. The statement was, in substance, that on August 12, 1928, plaintiff in error heard Joe Jacks and Carl Stepina talking about the proposed robbery of the messenger of the Service State Bank, located at 5601 West North avenue, at St. Louis and Chicago avenues; that Jacks and Stepina asked him if he wanted to come along and get in on the job, but he told them that he did not have the nerve; that Jacks asked him if he could lend him a pistol and said he would fix him up if he did; that he made an appointment to meet Jacks on Monday, August 13, at about 2:00 o'clock P. M., in Melrose Park, at Twenty-third avenue and Lake street; that at that time he went out to the saloon there and met Jacks; that Carl Torracco, the owner of the saloon, was there; that he gave Jacks a gun in the presence of Torracco; that he made an agreement with Jacks as he gave him the gun to come back to Melrose Park and meet him at Torracco's

house on Tuesday, August 14, at 2:00 P. M.; that he kept the appointment, and when he arrived at Torracco's house Jacks and Torracco told him that "the spot was dead;" that Jacks asked to keep the gun until August 21, when they expected to pull the job; that Torracco and Jacks talked about getting a car the night before they expected to pull the job; that he made an appointment with Jacks to meet him at Torracco's house on August 21, 1928, in Melrose Park; that he got there on that day about 12:30 or 1:00 P. M., a little earlier than he should have been; that he was standing about a block and a half from Torracco's house when he noticed a green Cadillac car turn the corner, going north on Fifteenth avenue; that it stopped about fifty feet away from him; that he saw Torracco, "Fat" Bishop, Harold Clifford and Carl Stepina get out of the Cadillac car and start to walk towards Torracco's house; that at that time Bishop was carrying a black leather brief case and Clifford carried a shot-gun with a newspaper around it, the barrel and the butt end of the gun being in plain view as he walked, about ten feet in the rear of them, to Torracco's house; that Jacks was behind the wheel of the car and David Taddeo was sitting in the front seat alongside of Jacks; that he went into Torracco's house and saw Torracco, Stepina, Bishop and Clifford sitting there; that just as he walked in they were all "happy," and Torracco said that he would quit the racket now; that in about twenty minutes Jacks and Taddeo came in; that Jacks told him to step out a minute, and that he went into the dining room and sat down; that in a couple of minutes Jacks came in and gave him $100 in ten-dollar bills and told him to "blow"; that before he left he asked Jacks for his gun, but Jacks told him not to take it just then but to come back that night for it, because if he took it then he might get "nailed, because things were hot;" that he then left and went home; that he stayed around home until about 8:00 o'clock, when he started in a Yellow cab to

594

Melrose Park; that when he got to Twenty-third avenue and Lake street he was arrested by Cusack.

Plaintiff in error testified, denying all connection with or knowledge of the crime. He denied knowing Jacks, Stepina, Torracco, Taddeo, Bishop or Clifford and denied having had any of the conversations mentioned in the statement with reference to the proposed robbery. He testified that the $80 found on his person was money that his father had given him to pay the rent. He testified that on August 21, 1928, he was working on an ice wagon with Ben Ensworth from 7:00 o'clock in the morning until 3:00 o'clock in the afternoon. Ensworth corroborated this testimony. Paul Raymond, the father of plaintiff in error, testified that on August 21, 1928, he gave his son, George, $80 and told him to pay the rent.

On the trial of the case, before the evidence was closed, the following appears in the bill of exceptions: "The defendant agrees to include in the assignment of error and his statement of facts that the question of the weight of the evidence is not to be raised as a point of error." It is contended by plaintiff in error that "the *corpus delicti* can not be proven by the statement of a defendant, there being no further proof on the point." That rule of law can have no application here, as the *corpus delicti* was fully proven by the witness Peterson.

Plaintiff in error complains of an instruction stating, in substance, that a free and voluntary confession by a person accused of crime, made after arrest, if proven beyond a reasonable doubt, may be sufficient to warrant a conviction without any other corroboration, where there is evidence that the crime has, in fact, been committed. Plaintiff in error does not, however, point out any particular wherein this instruction does not state the law correctly.

It is contended by plaintiff in error that it does not appear that the offense charged was committed in Cook county, as alleged in the indictment. Peterson testified that

the hold-up happened in the city of Chicago, county of Cook and State of Illinois. In plaintiff in error's written statement admitted in evidence he stated that the conversations had between him and Jacks with reference to his furnishing the gun for the hold-up, and his furnishing the gun, took place in Melrose Park. Melrose Park is in Cook county, Illinois. *People* v. *Golub,* 333 Ill. 554; *Linck* v. *City of Litchfield,* 141 id. 469; *Harding* v. *Strong,* 42 id. 148.

It is contended by plaintiff in error that there is no proof that the parties referred to in the statement committed the robbery and there is no proof that he aided them. Plaintiff in error and the parties named in the statement made an arrangement that the messenger of the Service State Bank was to be robbed at a certain time and place. The messenger was robbed as agreed upon. There were five parties to the robbery. The robbers were in a large new car and used a shot-gun and revolver in perpetrating the robbery. Shortly thereafter the parties mentioned in the statement were seen by plaintiff in error in a large green Cadillac car, one of them carrying a shot-gun and another a brief case. Plaintiff in error met the parties named in the statement at the time previously appointed for him to receive his revolver and be "fixed up for its use." He was given $100 and told not to take his gun at that time because if he took it he might get "nailed, because things were hot." This uncontradicted evidence is sufficient to show that the parties named in the statement were principals in the crime, and, plaintiff in error having furnished them with a revolver to use in the commission of the crime with the understanding that he would be "fixed up" if he did so, was an accessory before the fact and consequently guilty as a principal.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*